IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

EQUAL EMPLOYMENT              )
OPPORTUNITY COMMISSION,       )
                             )
    Plaintiff,           )     NO. 3:19-cv-00898
                             )     JUDGE RICHARDSON
v.                            )
                             )
CLARKSVILLE HEALTH SYSTEM,     )
G.P.,                         )
                             )
    Defendant.           )

## <u>MEMORANDUM OPINION</u>

Pending before the Court is "Defendant's Motion for Summary Judgment" (Doc. No. 47, "Motion"), supported by an accompanying Memorandum. (Doc. No. 48). Plaintiff filed a response (Doc. No. 53, "Response"), and Defendant filed a reply (Doc. No. 59, "Reply"). For the reasons stated herein, Defendant's Motion will be **GRANTED** in part and **DENIED** in part.

## FACTUAL ALLEGATIONS[1]

### I.    Ferrell's Employment and Injury

Mary Ferrell graduated from Hopkinsville Community College with an associate degree in nursing in 2003. (Doc. No. 56-13 at 6). She worked as a Registered Nurse ("RN") in various hospitals and health centers from 2005 (*Id.*) until she was hired by Defendant Clarksville Health System ("Defendant" or "the Hospital") as an Emergency Department ("ER") RN in November 2014 (Doc. No. 54 at 22). Ferrell had to resign briefly in early December 2015 (*Id.*), but she was

---

[1] Unless otherwise noted, the facts and contentions referred to in this section are taken from Plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 55). Facts that are stated herein without qualification are undisputed and treated as such. Alleged facts that are qualified here in some way (as for example by being prefaced with "Plaintiff contends that") are in dispute and are treated as such.

rehired by the Hospital for the same position later that month. (Doc. No. 55 at 1). On December 23, 2015, Ferrell received and signed a new job description for her RN position in the ER, which included the physical requirements of the position. (*Id*.). At this point in time, Ferrell could perform the physical requirements of the job as stated in the RN job description.[2] (*Id*. at 3).

On November 26, 2016, Ferrell slipped on a wet floor at work and injured her right knee. (*Id.* at 3-4). On December 7, 2016, Ferrell's orthopedist, Dr. Keith D. Starkweather, issued Ferrell physical restrictions related to her right knee injury. (*Id*. at 4). These restrictions included avoidance of prolonged standing or walking, and additionally Dr. Starkweather noted that Ferrell "should have majority of work time being seated. Only walk or stand for a few minutes (3 min) or 20 feet." (*Id.*). To accommodate these restrictions, the ER director, Darlene Vaughan, arranged for Ferrell to work as a triage nurse in the Hospital's ER. (*Id.*, Doc. No. 48 at 3). This position allowed Ferrell to sit at a desk, while a provided aide would get patients and bring them to her. (Doc. No. 55 at 4).

On December 15, 2016, Dr. Starkweather diagnosed Ferrell with an anterior cruciate ligament (ACL) tear, for which she had surgery on January 13, 2017. (*Id.* at 5). From January 16 to April 5, 2017, Ferrell was unable to work. (*Id.*). When Ferrell returned to work on or shortly after April 5, she resumed her normal duties, but found that her knee began to swell during her shifts. (*Id*). On May 1, Dr. Starkweather advised Ferrell not to work any overtime, and Defendant accommodated this suggested restriction. (*Id*.). However, Ferrell's knee continued to swell while she was working, and the pain was "excruciating." (*Id*. at 6). As a result, on May 23, Dr. Starkweather told Ferrell that she should be restricted to "sedentary activity for 1/3 [one-third] of

___

[2] Among other requirements, the updated ER RN job description stated that standing and walking up to 67 percent to 100 percent of each day was a "physical ability requirement." (Doc. No. 47-1 at 145).

a workday." (*Id.*). At this point, Ferrell continued to work in the ER, but did so primarily in the "secure hold" unit, an enclosed area for psychiatric patients. (Doc. No. 48 at 4). Working in the secure hold area allowed Ferrell to remain seated for most of her shift. (*Id.* at 5, Doc. No. 54 at 4). Defendant contends that placement in the secure hold area was not a stand-alone position and was actually "part of the regular ER nurses' rotation." (Doc. No. 48 at 5).

On June 27, 2017, Dr. Starkweather recommended that his previously suggested restrictions become permanent when Ferrell reached maximum medical improvement ("MMI"), meaning she would not recover further. (Doc. No. 55 at 6). At that time, Dr. Starkweather's recommended restrictions read, "[m]ay return to work full duty with permanent restrictions of sedentary activity for one-third of workday with right leg elevated. Sedentary workday can be intermittent and not continuous." (*Id.* at 7). With Dr. Starkweather's recommended permanent restrictions in place, Ferrell continued to work in the ER but could not do all the tasks that a regular RN in the ER would handle. (*Id.* at 8).

On July 18, 2017, Ferrell met with Sean Jones, the Hospital's HR Director, and Vaughan to discuss her permanent restrictions. (*Id*. at 8-9). Plaintiff contends that during this meeting, Jones and Vaughan informed Ferrell that she could no longer work in the ER because of her restrictions. (Doc. No. 54 at 4). In turn, Ferrell began applying for other RN positions at the Hospital to which she could transfer. (*Id.* at 5).

## II.       Ferrell's Applications for Positions to which she might transfer [3]

After the July 18, 2017 meeting, Ferrell applied for seven positions at the Hospital to which she was interested in potentially transferring ("potential transferee positions").[4]

- Clinical Documentation Specialist

- an RN position in the Operating Room ("OR")[5]

- an RN position in the Wound Clinic[6]

- an RN position in the Urology Clinic

- an RN position in the Cardiology Clinic

- an RN position in the ER[7]

- an Inpatient Rehab Liaison position

---

[3] In the Court's view, it is appropriate to arrange the (alleged) facts not in an entirely chronological manner, but instead based to some extent on the potential transferee positions. The effect of this, the reader is cautioned, is that the alleged facts are not set forth in an entirely sequential fashion and that in a couple of places, due to a change in the discussion as to the potential transferee position being discussed, the narrative reverts to a juncture earlier than had already been discussed.

[4] In discussing the seven other positions for which Ferrell applied to or expressed interest in, the Court uses the term "transfer," as that is the terminology used by the Parties. (Doc. Nos. 48 at 20-21, 54 at 5). However, it appears to the Court that Ferrell's applications for transfer were substantively and procedurally the same as an application for the position from someone not then employed by Defendant and thus not in a position to transfer (*i.e.* an external applicant).

[5] Plaintiff notes that when Ferrell applied to the OR RN position, she was under the impression that she was actually applying to the Pre-Admission Testing ("PAT") position. (Doc. No. 55 at 10). Thus, she did not intend to request an accommodation in the form of transfer to the OR RN position. Therefore, the Court will not consider whether Ferrell should have been transferred to the OR RN position as a reasonable accommodation but will instead consider whether the PAT position, as to which Plaintiff expressed interest and interviewed, was a reasonable accommodation that Plaintiff should have received.

[6] Plaintiff concedes that Ferrell did not meet the education requirements for the Wound Clinic position (Doc. No. 54 at 5), so the Court will not further consider whether this position was a reasonable accommodation.

[7] Plaintiff notes that Ferrell testified that when she applied for an RN position in the ER (the same type of position she had previously been working in and was no longer able to do), she thought she was applying for a full-time position in the secure hold unit. (Doc. No. 56-1 at 48).

(*Id.* at 10). Though Ferrell did not formally apply, she also expressed interest in an eighth position (Case Management) and was interviewed for a ninth position (Pre-Admission Testing, or "PAT"). (*Id.*).

Ferrell's interview for the PAT position occurred on July 19, 2017, when she interviewed with Jan Stumphf, a PAT Charge Nurse, and three other nurses. (*Id.* at 12). According to the Interview Evaluation Matrix of Ferrell, Stumphf noted that Ferrell seemed uncommitted to the Hospital and that she (Stumphf) would "hesitate to hire" Ferrell as a result. (*Id.* at 13). Another candidate for the position, Sunnie Patat, was deemed the most qualified candidate by Carolyn Shupp, the hiring manager for the PAT position. (*Id.*). As a result, Patat, not Ferrell, was offered the job. (*Id.*).

Also on July 19, Ferrell applied for a Clinical Documentation Specialist ("CDI") position at the Hospital. (*Id.* at 14). The job description for the CDI Specialist position required standing and walking only 10 percent of the time and thus was compatible with the standing/walking limitations imposed by Ferrell's physical restrictions. (*Id.*). For that position, the Hospital's corporate staff would recommend to the Hospital's hiring staff whether a CDI Specialist candidate should be hired or not. (*Id.* at 15). Then, after receiving a recommendation, Linda Ellis (the Hospital Director of Health Information Management) and the Hospital's Chief Financial Officer would make the final decision. (*Id.*). The Hospital's corporate staff told Ellis to send forward only candidates with ICU experience. (*Id.*). A few months prior, on April 4, 2017, Crystal Payne applied for the CDI Specialist position. She had worked as an RN in the ICU since August 2015 and had previously worked as an RN in the ICU from January 2011 to October 2014. (*Id.*). Payne also had experience as a Medical Records Director and Clerk. (*Id.*). On July 20, 2017, Jones told Ferrell he would share her (Ferrell's) application with Ellis, which he did in an email. (*Id.* at 16). Ferrell did

not list ICU experience on her CDI application, but it was on her resume. (*Id.* at 16-17). On September 18, 2017, Payne was hired for the CDI position. (*Id.* at 17). Additionally, the Case Management position in which Ferrell had expressed interest was filled by Shannon Summerville, after the Hospital's first-choice candidate declined the offer. (*Id.* at 18). Summerville had a master's degree in nursing, and the Case Management job listing stated that a Bachelor of Science in nursing ("BSN") was preferred. (*Id.* at 19).

Then, on July 21, 2017, Ferrell applied for an RN position with Crown Services (a different employer) and was hired to start on August 7, 2017. (*Id.* at 11). The position with Crown Services involved sitting for 90 percent of the day. (*Id.* at 12). Plaintiff contends that Ferrell was "forced to seek outside employment," though she continued to seek a position at the Hospital. (*Id.* at 11). Accordingly, on July 23, 2017, Ferrell applied for a position as an RN in the Urology Clinic but was not hired. (*Id.* at 19-20).

On August 16, 2017, the Hospital offered Ferrell a Registrar position, which was compatible with the limitations imposed by her restrictions as it did not require her to stand or walk more than two-thirds of the day. (*Id.* at 21). Plaintiff contends that Ferrell was insulted and offended because the Registrar position paid only $11.44 per hour, a third of her RN salary. (*Id.*). Consequently, Ferrell did not respond to the offer. (*Id.* at 22). On August 21 and 29, Jones asked Ferrell for her response to the Hospital's offer of the Registrar position, but Ferrell still did not answer. (*Id.* at 23). On August 28, 2017, Ferrell applied for an RN position at the Hospital's Cardiology Clinic, but the hiring manager for the position, Latonya Cross, does not remember seeing her application. (*Id.*). Cross hired another candidate for the position instead. (*Id.* at 24). Finally, on September 23, 2017, Ferrell applied for an inpatient rehab coordinator position, which

had a job description stating that a bachelor or master's degree was preferred. (*Id.*). But another candidate, who had a BSN, was hired. (*Id.* at 25).

## PROCEDURAL HISTORY

Plaintiff, the Equal Employment Opportunity Commission ("EEOC"), filed the present action to enforce the ADA (in accordance with 42 U.S.C. § 12117(A)) on October 10, 2019.[8] (Doc. No. 1 at 2). Plaintiff brings two claims under the Americans with Disabilities Act ("ADA"): one for discriminatory discharge and one for a failure to accommodate. On March 19, 2021, Defendant brought a Motion for Summary Judgment on both claims. (Doc. No. 47). Plaintiff responded (Doc. No. 55) and Defendant replied (Doc. No. 59). The Motion is now ripe for review.

## LEGAL STANDARDS

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

---

[8] Notably, cases quoted (or paraphrased) herein that refer to the "plaintiff" are usually talking about the employee herself who brought suit. In considering the applicability of these cases, the reader should keep in mind that these cases' references to "the plaintiff" are, in some instances, intended to refer specifically to the *litigant*—here, the EEOC—and what the litigant can or must do to prevail, and in some instances are intended to refer to the affected employee (who usually is the litigant, but in this case is not) and the experiences, duties, circumstances, actions, etc. of the employee.

A fact is "material" within the meaning of Rule 56(c) if its proof or disproof might affect the outcome of the suit under the governing substantive law. *Id*. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc*., 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed. R. Civ. P. 56(c)(1)(B). If the summary judgment movant meets its initial burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.[9] Importantly, "[s]ummary judgment for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex*, 477 U.S. at 322).

Any party asserting that a fact cannot be or genuinely is disputed—*i.e.*, any party seeking summary judgment and any party opposing summary judgment, respectively—can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the

---

[9] Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id.* The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id.* The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at *5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

The Court will take a moment here to discuss the *McDonnell Douglas* standard and its applicability to motions for summary judgment in the context of employment-discrimination

claims in the federal judicial system. The Sixth Circuit has summarized the applicability and workings of the *McDonnell Douglas* burden shifting framework as follows:

> A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).
>
> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence. . . . Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (citations omitted).

The burden-shifting approach in *McDonnell Douglas* applies only to discrimination or retaliation claims premised on so-called indirect (*i.e.*, circumstantial) evidence.[10] *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019). The undersigned has recently explained:

> When a defendant-movant challenges a plaintiff's ability to reach a jury on an indirect-evidence theory of employment discrimination, there are a number of steps potentially implicated, though not all of them necessarily need be addressed in the analysis. The number of steps to be addressed depends on whether the defendant-movant seeks to prevail at the first step, or at the second and third step, or at both the first step and the second and third step . . .
>
> To prevail at the first step of *McDonnell-Douglas*, the defendant, as the summary-judgment movant, must meet its initial burden of showing an absence of evidence from which a reasonable jury could find the plaintiff established a *prima facie* case. *E.g., Banks v. State of Ohio*, No. 94–3866, 1995 WL 118993, * 2 (6th Cir. Mar. 20, 1995). If the defendant does so, then the burden shifts to the plaintiff to show that at trial it could "make out a *prima facie* case of discrimination by a

---

[10] "Direct evidence is such that, if true, requires the conclusion that unlawful retaliation [or discrimination] was a motivating factor without any inferences or presumptions." *Banks v. Bosch Rexroth Corp.*, 15 F. Supp. 3d 681, 693 (E.D. Ky. 2014), *aff'd*, 610 F. App'x 519 (6th Cir. 2015) (citing *Norbuta v. Loctite Corp.*, 181 F.3d 102 (6th Cir. 1999)). Indirect evidence is evidence that requires the court to make inferences to conclude that unlawful retaliation or discrimination was a motivator for an adverse employment action.

preponderance of the evidence." *Redlin*, 921 F.3d at 606. If the plaintiff fails to succeed here, then the plaintiff suffers summary judgment in favor of the defendant on the claim. But if the plaintiff succeeds here, defendant does not prevail at the first step and is relegated to try instead to prevail at the second and third steps of *McDonnell-Douglas.*

At the second step, the defendant-movant has the burden (of production only) to show a legitimate and non-discriminatory reason for its action(s). *Brown*, 814 F. App'x at 80 (noting, on the defendant's motion for summary judgment that it is a "burden of production [that potentially] shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff"). If the defendant successfully shows evidence of a non-discriminatory reason for its alleged discriminatory act, the court proceeds to the third step, where "the plaintiff must rebut the proffered reason by producing evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext" for unlawful discrimination. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020) (quotations omitted).

*Veith v. Tyson Fresh Meat, Inc*., No. 3:19-CV-01065, 2022 WL 891836, at *9-10 (M.D. Tenn. Mar. 25, 2022). As will be further discussed below, one of Plaintiff's claims is premised on indirect evidence and thus subject to the *McDonnell Douglas* framework.

## DISCUSSION

## I.     Defendant Will Be Granted Summary Judgment as to Plaintiff's Claim for Discriminatory Discharge.

### A.     Plaintiff does not have direct evidence to support its discriminatory discharge claim.

The Court will first consider whether Plaintiff has direct evidence of discriminatory discharge. Plaintiff contends that there is direct evidence of discrimination and that therefore this claim survives the Motion irrespective of the outcome of any analysis under the *McDonnell Douglas* framework utilized in indirect-evidence cases. In fact, if Plaintiff is correct that there is direct evidence to support this claim, it need not rely on (and the Court need not address) an indirect-evidence theory under *McDonnell Douglas* at all. *See Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381–82 (6th Cir. 2002) ("It is well settled that if a plaintiff presents direct

evidence of discrimination, she need not proceed under the *McDonnell Douglas* formula." (citation omitted)); *Hicks v. U.S. Off. of Pers. Mgmt.*, No. 2:05CV100, 2006 WL 8441765, at *2 (S.D. Ohio June 20, 2006) ("In a case alleging employment discrimination in violation of Title VII, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive."); *Diaz v. City of Inkster*, No. CIVA05-CV-70423-DT, 2006 WL 2192929, at *9 (E.D. Mich. Aug. 2, 2006) ("Plaintiff's presentation of direct evidence means that the burden-shifting paradigm (for indirect evidence) does not apply.").[11]

Plaintiff contends that evidence of certain statements by Defendant's employees constitute direct evidence of discrimination. Among this (purported) direct evidence is deposition testimony of Vaughan wherein she recalled meeting with Ferrell once her restrictions became permanent and explaining that Ferrell "wouldn't be able to continue her job as she was doing." (Doc. No. 56-34 at 4). Also among this (purported) direct evidence is Ferrell's deposition testimony that in the same meeting, she was told her employment would be terminated if they could not find her another

_____

[11] The quote from *Diaz* calls to mind an important distinction. If the plaintiff presents direct evidence, then (as *Diaz* states) the burden-shifting paradigm *for indirect evidence* does not apply, but a different kind of burden-shifting does apply. Specifically, "[w]hen a plaintiff establishes discrimination through direct evidence, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 523 (6th Cir. 2007). This one-step, uni-directional burden-shifting is not the potentially two-step and bi-directional burden-shifting prescribed by *McDonnell Douglas*, but it is a kind of burden-shifting nonetheless. It is important to keep these differences in mind. *See Erwin v. Potter*, 79 F. App'x 893, 899 (6th Cir. 2003) ("Therefore, the district court erred when it stated that under both direct and circumstantial evidence methods of proof, [the plaintiff] must 'show that his age was a determining factor in his termination.' To the contrary, under the direct evidence approach, the [defendant] must show a legitimate reason for terminating [the plaintiff]'s employment that was not related to his age."). But this is admittedly difficult to keep in mind when no less of an authority than the Sixth Circuit has expressly (but, alas, imprecisely and confusingly) described a direct-evidence theory as distinguishable from an indirect evidence (*McDonnell Douglas*) theory on the ground that the latter (and only the latter) is a "burden-shifting theory." *See Briggs v. Potter*, 463 F.3d 507, 514 (6th Cir. 2006).

(suitable) position within ten days. (Doc. No. 56-1 at 41). According to Plaintiff, these "pronouncement[s] constitute[] direct evidence of discrimination." (Doc. No. 54 at 20).

Direct evidence is that which "requires the conclusion that unlawful [discrimination] was a motivating factor in the employer's action. Specifically, direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Equal Emp. Opportunity Comm'n v. Dollgencorp, LLC*, 196 F. Supp. 3d 783, 806 (E.D. Tenn. 2016), *aff'd*, 899 F.3d 428 (6th Cir. 2018), (citing *Rowan v. Lockheed Martin Energy Sys., Inc*., 360 F.3d 544, 548 (6th Cir. 2004)). However, there is nothing in Plaintiff's offered evidence that suggests any unlawful discrimination. It is not necessarily unlawful for an employer to terminate an employee for reasons related to her disability; it may be perfectly lawful to terminate an employee who (because of her disability) cannot perform the essential functions of her position even with every reasonable accommodation. From the statements cited by Plaintiff, the Court can tell that Ferrell's disability-based restrictions were likely a factor in her ultimate termination, but the Court would still have to draw inferences to determine that the termination was due to unlawful discrimination rather than, for example, a concern that she could not perform the essential functions of the job even with every reasonable accommodation. "Direct evidence of disability discrimination 'does not require the fact finder to draw any inferences [to conclude] that the disability was at least a motivating factor.'" *See Fisher v. Nissan N. Am., Inc*., 951 F.3d 409, 416 (6th Cir. 2020) (quoting *Hostettler*, 895 F.3d at 853). A statement that merely expresses concern about the plaintiff's ability to perform job requirements is *not* direct evidence of disability discrimination. *See Wright v. Memphis Light, Gas & Water Div.*, 558 F. App'x 548, 553 (6th Cir. 2014) (discussing *Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 453-554 (6th Cir. 2004)). Rather, evidence is direct evidence of disability discrimination only if it reflects the employer's discriminatory animus. *See id.* Plaintiff's purported evidence fails to

do this, and thus Plaintiff cannot be credited with having offered direct evidence of disability discrimination. As the undersigned has stated previously,

> Plaintiff does not offer any direct evidence that she was discriminated against based on her membership in the protected class of persons with disabilities; that is, she does not offer any evidence that would require the conclusion, without resort to the drawing of inferences, that her termination was motivated by discriminatory animus towards persons with disabilities (or, to put it just slightly differently, by animus against Plaintiff because she is a person with a disability).

*Veith v. Tyson Fresh Meat, Inc.*, No. 3:19-CV-01065, 2022 WL 1231229, at *9 (M.D. Tenn. Apr. 26, 2022).

Accordingly, lacking direct evidence, Plaintiff is relegated to proceeding on an indirect-evidence theory under *McDonnell Douglas*.

**B.** <u>Plaintiff fails to make a *prima facie* showing of its indirect-evidence discriminatory discharge claim</u>.

"A prima facie [indirect-evidence] case of disability discrimination under the ADA requires that a plaintiff show: 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation;[12] 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained

---

[12] In other cases, the Sixth Circuit used the term "qualified," rather than "otherwise qualified," to refer to the second element. *E.g.*, *Becker v. Elmwood Loc. Sch. Dist.*, 519 F. App'x 339, 342 (6th Cir. 2013) (citing *Whitfield v. v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011)). The undersigned has concluded that with respect to the elements of an indirect-evidence *prima facie* case of disability discrimination under the ADA, the applicable concept is the plaintiff being *qualified* (with or without reasonable accommodation). The undersigned need not dwell herein on the basis for that conclusion, other than to say that the term "otherwise qualified" tends to suggest inappropriately that the mere fact that someone has a disability renders him or her unqualified such that the best he or she can hope of is to be "otherwise" qualified, *i.e.*, qualified but for the fact that the disability somehow necessarily makes him or her unqualified. In the context of the second element, the concept of the plaintiff being *otherwise* qualified (with or without reasonable accommodation) is simply inapplicable, and if a court uses the term "otherwise qualified" to define the second element, the court is being inexact and could not properly mean (and typically clearly does not intend to mean) anything other than "qualified" (with or without reasonable accommodation). To the extent that the term "otherwise qualified" appears herein, it is only because the cases quoted herein happen to use that term.

open while the employer sought other applicants or the disabled individual was replaced." *Keogh v. Concentra Health Servs., Inc.*, 752 F. App'x 316, 324 (6th Cir. 2018) (quoting *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008)).

Defendant challenges Plaintiff's ability to demonstrate the second element, *i.e.*, that Ferrell was qualified for the position, with or without reasonable accommodation. Importantly, "[a]n employee is qualified for her position if she can perform the essential functions of her job with or without a reasonable accommodation." *Thompson v. Fresh Prod., LLC*, 985 F.3d 509, 524 (6th Cir. 2021). Conversely, if the employee (plaintiff) cannot do so, then she is not qualified; in other words, if an employee cannot perform the essential functions of her job with or without a reasonable accommodation, then the employee necessarily is not qualified for the position with or without a reasonable accommodation. *See Pol'y Mgmt. Sys. Corp.*, 526 U.S. at 806 (with respect to a claim of disability discrimination, "[a]n ADA plaintiff bears the burden of proving that she is a 'qualified individual with a disability'—that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of her job." (quoting 42 U.S.C. § 12111(8))).[13] Indeed, the second element is sometimes framed in terms of the employee being qualified to perform *the essential functions of* the position. *See, e.g., Olds v. United Parcel Serv., Inc.*, 127 F. App'x 779, 782 (6th Cir. 2005) ("To state a claim under the ADA, a plaintiff must demonstrate: '(1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability.'" (quoting *McKay v. Toyota Motor Mfg., U.S.A., Inc.,* 110 F.3d 369, 371 (6th Cir. 1997))).

---

[13] As is unfortunately often unappreciated, with respect to a claim of *failure to accommodate*, a plaintiff has alternatives for establishing a *prima facie* case of disability discrimination that do *not* require her to show that she can perform the essential functions of the job with or without a reasonable accommodation.

The undersigned has previously discussed the question of what constitutes an essential function:

> The ADA provides that in determining the "essential functions" of an employment position, "consideration shall be given to the employer's judgments to what functions of a job are essential, and if an employer had prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Similarly, the EEOC regulations applicable to the ADA provide that the term "essential functions" means "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1360.2(n)(1). "The term 'essential functions' does not include the marginal functions of the positions." *Id.* The EEOC regulations further provide that evidence of whether a particular function is essential includes, but is not limited to:
>
> > (i) The employer's judgment as to which functions are essential;
> > (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> > (iii) The amount of time spent on the job performing the function;
> > (iv) The consequences of not requiring the incumbent to perform the function;
> > (v) The terms of a collective bargaining agreement;
> > (vi) The work experience of past incumbents in the job; and/or
> > (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

*Berry v. SAGE Dining Servs., Inc.*, No. 3:19-CV-00830, 2021 WL 3037483, at *6–7 (M.D. Tenn. July 19, 2021).

> 1. *Plaintiff lacks evidence to meet her burden of showing that she is qualified for the position without an accommodation.*

To refute that Plaintiff could show that she could perform the essential functions of the ER RN position without an accommodation, Defendant first notes that Ferrell signed a job description for the ER RN position in December 2015, (Doc. No. 47-1 at 22), which listed "walking" and "standing" as physical requirements that could occur 67 percent to 100 percent of the time. (*Id.* at

144-45).[14] Defendant additionally notes that Vaughan—the ER Director—testified in her deposition that an ER RN job included walking or standing 67 percent to 100 percent of the time. (Doc. No. 47-3 at 5-6), and that Jones similarly acknowledged such. (Doc. No. 47-2 at 11). Additionally, Defendant notes that Dr. Starkweather determined that Ferrell had reached MMI in June 2017 (Doc. No. 47-1 at 150), and Ferrell herself admitted she was not going to improve beyond her permanent restrictions. (*Id.* at 27). Ferrell also admitted that with her permanent restrictions, she could not walk or stand upwards of 67 percent of the time. (*Id.* at 79, 91, 98, and 143).

All of this tends to suggest that Plaintiff would be unable to establish the second element of an indirect-evidence *prima facie* case of disability discrimination, *i.e.*, that she was qualified for the position, by virtue of being able to perform its essential functions, without reasonable accommodation. The Court concludes Defendant has sufficiently met its initial burden to show a lack of genuine dispute of material fact as to the question of whether Ferrell was qualified for her ER RN position *without an accommodation*. The burden now shifts to Plaintiff to demonstrate there is a genuine dispute of material fact as this question.

To meet this burden, Plaintiff argues that walking or standing for *more* than 67 percent of a shift was not an essential function of an ER RN. And if 67 percent was the maximum requirement for walking or standing, Plaintiff argues, then Ferrell could perform the essential functions even with her restriction requiring her to be seated at least one-third of the day. Plaintiff cites to the job

---

[14] As will be discussed further below, on the issue of what constitutes an essential function of a position, "consideration by the Court of a submitted job description is statutorily mandated, but that is not to say that the job description by itself is dispositive." *Thompson v. Hendrickson USA, LLC*, No. 3:20-CV-00482, 2021 WL 848694, at *16 (M.D. Tenn. Mar. 5, 2021); *see also Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1022–23 (6th Cir. 2013) ("As the employer, [Defendant's] opinion that hauling is an essential function carries weight but is only one factor to be considered.").

description that Ferrell signed in November of 2014, when she was first hired by the Hospital. That job description stated that walking and standing were required only 34 percent to 66 percent of the day. (Doc. No. 56-39). Though the updated job description Ferrell signed in December of 2015 states a requirement of walking and standing for 67 percent to 100 percent of the day, Plaintiff asserts that Jones "could offer no explanation for the change." (Doc. No. 54 at 22). However, at his deposition, Jones provided at least a *procedural* explanation for the change when he testified: "I can't definitively say what happened. I was not here at the time. However, on an annual basis, we ask our managers, our directors of each unit, to review their job descriptions and make any edits or changes as more appropriate to what the job does." (Doc. No. 56-24 at 11). In other words, Jones testified (based on knowledge that has not been asserted to be inadequate) in effect that, although he could not say for sure, this change well could have been the result of an annual process designed to improve the correlation between a job description and the actual functions of the job. So it is a stretch to state that Jones "could offer no explanation for the change"; at the very least he offered a possible (and quite plausible) explanation. The Court realizes that Jones could not say for sure that this was case and that (even if it was the case) he could not say for sure that *the particular change* here at issue actually was made for the reason contemplated by Jones' explanation, *i.e.*, that the unit director thought it was necessary to make the job description better correlate with the actual job functions of an ER RN. But this argument is of little value, as Plaintiff points to—and the Court could find on its own—no case law suggesting that a defendant-employer needs to justify the content of a job description (whether in its original form or amended) for the Court to give weight to the job description. Rather, an employer's job description is given weight and it is on the plaintiff to "rebut the written job description concerning what constitutes an essential function of a job." *Camp v. BI-LO, LLC*, 662 F. App'x 357, 362 (6th Cir. 2016). To the

extent that Plaintiff undertakes to rebut the written job description, those efforts are set forth in the following paragraph and are unsuccessful for the reasons discussed.

Plaintiff cites to Ferrell's deposition testimony stating her belief that she could meet the ER RN requirements of walking or standing. (Doc. No. 54 at 22 (citing to Doc. No. 56-1 at 10)). But that is not considered in making the determination of what constitutes an essential function. *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 764 (6th Cir. 2015) ("Neither the statute nor regulations nor EEOC guidance instructs courts to credit the employee's opinion about what functions are essential. That's because we do not 'allow employees to define the essential functions of their positions based solely on their personal viewpoint and experience.'" (quoting *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004))). Plaintiff also relies on Ferrell's deposition testimony that, based on her observations, ER nurses almost never stand for 100 percent of a shift, and often sit down to chart and complete reports. (Doc. No. 54 at 22 (citing to 56-1 at 13)). However, this testimony is not helpful in the analysis, because it includes no assertion as to how much time is spent sitting to chart or complete reports (as opposed to standing or walking) beyond the claim that less than *100 percent* of the time is spent standing—a fact that by itself is immaterial because anything more than 67 percent would be outside of Ferrell's capabilities. Finally, Plaintiff cites deposition testimony of Dr. Bentley Hankins,[15] Plaintiff's expert witness, who notes that many ER RN positions involve tasks that could be done seated or standing. (Doc. No. 56-41 at 7). But such testimony does not serve to effectively counter the notion that an ER RN

---

[15] Dr. Bentley Hankins is a member of Hankins & Hankins, a "Vocational and Rehabilitation Economic Consulting" firm. (Doc. No. 56-4 at 1). As Plaintiff's expert witness, she provided an "Independent Vocational Evaluation Report" to assess "whether Mary A. Ferrell was minimally qualified for, and was able to perform the essential functions with or without reasonable accommodations of, the seven vacant registered nurse (RN) positions with [Defendant] to which she applied between July 2017 and September 2017 . . ." (*Id.*).

would need to be standing *more than two-thirds of the time*; the mere fact that many tasks could be done seated does not indicate how much time those tasks account for, or how many tasks (and for how long) must be done while standing.

Considering the evidence presented by Plaintiff (such as it is), the Court does not believe that a reasonable jury could find in Plaintiff's favor on the question of whether Ferrell could perform the essential functions of an ER RN position *without an accommodation* based solely on Hankins's report. The evidence pointed to by Defendant makes clear she cannot.

2. *Plaintiff lacks evidence to meet her burden of showing that she is qualified for the position even with a reasonable accommodation.*

Though the Court concludes that a reasonable jury could not find that Ferrell was able to perform the essential functions of her ER RN position *without an accommodation*, Plaintiff could still establish the second element of a *prima facie* indirect-evidence case by showing that Ferrell could perform the essential functions of her position *with a reasonable accommodation*. Defendant suggests (Doc. No. 48 at 15) that Ferrell proposed two possible alternative accommodations to allow her to remain in her position as an ER RN: continuing to work as a triage nurse (a job that undisputedly she performed after her initial injury, (Doc. No. 55 at 4)); or receiving a permanent position in the ER's secure hold unit (an area in which she undisputedly worked for a certain time period when she received her temporary restrictions, (Doc. No. 55 a 6)).

To show that neither proposed accommodation is reasonable, Defendant states that accommodating Ferrell through giving her a permanent position as a triage nurse would require the Hospital to provide Ferrell with a permanent assistant throughout the day, which is unreasonable. The Court agrees. *See Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999) ("Courts have continuously found that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the

employee cannot perform by virtue of his disability."). Additionally, as Defendant notes, it would not be a reasonable accommodation to give Ferrell a permanent position in the secure hold area of the ER because that was a position that was "part of the regular ER nurses' rotation." (Doc. Nos. 47-2 at 25, 47-3 at 8 (citing *Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 730 (6th Cir. 2000) (holding that there is no duty to "turn[] a rotating or relief position into a permanent position" as a reasonable accommodation))).

Accordingly, Plaintiff alternatively argues that Ferrell could have continued to perform the essential functions of the ER RN position if she was given a reasonable accommodation. Plaintiff cites to Ferrell's deposition where she states that the Hospital should have allowed her to continue to work the secure hold position as a potential accommodation. (Doc. No. 56-1 at 27). Plaintiff additionally cites to an email from Ferrell to Jones on July 23, 2017, in which Ferrell noted that she had requested to continue "light duty" in the secure hold unit of the ER as her accommodation. (Doc. No. 56-9 at 3). However, as discussed above, the secure hold position was a rotating position, and an employer has no duty to "turn[] a rotating or relief position into a permanent position" as a reasonable accommodation. *Hoskins*, 227 F.3d at 730. Accordingly, the Court determines that no reasonable jury could find Ferrell's proposed accommodation (of remaining in the secure hold unit) reasonable, and it does not appear that Plaintiff asserts any other proposed accommodations in the context of its claims for discriminatory discharge.

As the Court has determined that there is no genuine dispute as to whether Ferrell could perform the essential functions of her position as an ER RN with or without a reasonable accommodation, Defendant's Motion for Summary Judgment will be granted as to Plaintiff's claim for discriminatory discharge.

## II.   Defendant's Motion for Summary Judgment on Plaintiff's Claim for Failure to Accommodate Will Be Granted in Part and Denied in Part.

Defendant additionally seeks summary judgment on Plaintiff's failure-to-accommodate claim. ADA claims premised on failure to accommodate "necessarily involve direct evidence and the [*McDonnell Douglas*] burden shifting approach is not applicable." [16] *Fisher*, 951 F.3d at 416. The Sixth Circuit

---

[16] In making this statement, *Fisher* took pains to debunk occasional Sixth Circuit cases that held to the contrary:

> [W]e have occasionally—though generally in unpublished cases—analyzed a failure-to-accommodate claim under the indirect test. *See, e.g.*, *Keogh v. Concentra Health Servs.*, 752 F. App'x 316, 326 (6th Cir. 2018); *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018); *Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347, 350 (6th Cir. 2015); *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011). These cases do not explain why they apply the indirect test rather than the direct, nor do they distinguish *Kleiber* and its progeny. And each can be traced back to a single case, *DiCarlo v. Potter*, that applied the indirect test when analyzing a failure to accommodate claim under the Rehabilitation Act, not the ADA. 358 F.3d 408, 419 (6th Cir. 2004).[1] Our court, sitting en banc, has explained that though the two statutes have many similarities, they are not identical. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314–17 (6th Cir. 2012) (en banc). *Kleiber*, our foundational case establishing that ADA failure to accommodate claims are analyzed pursuant to the direct test, controls.

*Fisher*, 951 F.3d at 416–17. The Court is satisfied that *Fisher* adequately states prevailing Sixth Circuit law, and indeed its rationale (which the Court need not delve into here) seems sound. What is less sound, in the view of the undersigned, is the particular elements the Sixth Circuit has identified as the direct-evidence test. It is readily apparent that they allow a plaintiff to establish a (necessarily direct-evidence) case of failure to accommodate if the plaintiff: (i) satisfies element number one (1) and also satisfies element number two (2) *specifically by satisfying the first of the three alternative for satisfying the second element,* namely, that she was qualified for the position despite her disability without accommodation from the employer. A plaintiff who succeeds taking this path, however, has not in any way whatsoever implicated the notion of accommodation; the plaintiff has not had to establish that she made a request for an accommodation, or that a request for an accommodation was denied, or that any accommodation that was requested was reasonable. Instead, such a plaintiff has established a claim for failure to accommodate without presenting evidence that has anything to do with accommodation, let alone a failure by the employer to accommodate by denying a request for a reasonable accommodation. However, this Court is bound to follow prevailing Sixth Circuit precedent, and so it applies the test of *Kleiber/Fisher*.

The undersigned notes that he inserted the bracketed reference to make clear that it is the *McDonnell Douglas* version of burden shifting in particular that is inapplicable here because failure-to-accommodate claims involve direct evidence. Another kind of burden shifting actually *is* (at least potentially) applicable to such claims. Specifically, as noted below, if the plaintiff establishes the elements of a failure-to-accommodate claim, the burden shifts to the defendant to show "[either that] the challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose

uses a multi-part test to evaluate reasonable accommodation claims: "(1) The plaintiff bears the burden of establishing that he or she is disabled[, and] (2) The plaintiff bears the burden of establishing that he or she is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation."

*Tchankpa v. Ascena Retail Grp.*, *Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (quoting *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 869 (6th Cir. 2007)); accord *Fisher*, 951 F.3d at 417 (quoting *Kleiber*, 485 F.3d at 869). If the plaintiff carries its burden, the employer can then raise a defense that the "challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer." *Kleiber*, 485 F.3d at 869 (quoting *Hedrick*, 355 F.3d at 452).

It appears that Defendant is challenging only Plaintiff's ability to prove that Ferrell was qualified for the position with a proposed reasonable accommodation.[17] Plaintiff asserts that Ferrell's proposed reasonable accommodations were transfer to one of the other positions for which she applied and (according to her) was qualified. The Sixth Circuit has stated:

[A]n employer has a duty under the ADA to consider [as an accommodation] transferring a disabled employee who can no longer perform his old job even with accommodation to a new position within the Company *for which that employee is otherwise qualified*. We do not, however, hold that the employer must reassign the disabled employee to a position for which he is not otherwise qualified, or that the employer must waive legitimate, non-discriminatory employment policies or displace other employees' rights to be considered in order to accommodate the

an undue hardship upon the employer." This one-step, uni-directional burden-shifting is not the potentially two-step and bi-directional burden-shifting prescribed by *McDonnell Douglas*, but it is a kind of burden-shifting nonetheless.

[17] Under the recitation of the elements provided in *Tchankpa* (and *Kleiber* and *Fisher*), there are two other alternative avenues that Plaintiff could use to establish the second element of a failure-to-accommodate claim: that Ferrell was qualified without an accommodation or that Ferrell was qualified with an "essential" job requirement eliminated. The Court has already determined in its analysis of the previous claim that neither of those two avenues are available to Plaintiff, as there is no genuine dispute as to whether Ferrell could walk or stand for 67 percent to 100 percent of a workday and there is no genuine dispute as to whether doing so was an essential function of an ER RN position. Accordingly, Plaintiff must pursue the third avenue for proving the second element of its failure to accommodate claim.

disabled individual. Although the ADA itself does not place limits on an employer's duty to reassign disabled employees, the EEOC regulations interpreting the Act clearly prescribe the scope of an employer's obligation to accommodate such individuals. According to the regulations, an employer need only reassign a disabled employee to a vacant position.

*Burns v. Coca-Cola Enterprises, Inc*., 222 F.3d 247, 257 (6th Cir. 2000) (emphasis added). The

Sixth Circuit also has explained:

An ADA plaintiff is qualified for a job when she, "with or without reasonable accommodation, can perform the essential functions of the" position. 42 U.S.C. § 12111(8) (emphasis added). Accordingly, it is permissible for an employee to request a transfer to another job (itself an accommodation) that she can perform with an (additional) accommodation.

*Kleiber*, 485 F.3d at 870 (citing *Burns*, 222 F.3d at 257).

Defendant proceeds with its argument by explaining why it was not required to accommodate Ferrell via transfer to any of the positions she applied for or expressed interest in. Defendant argues that the Case Management position was not available when Ferrell expressed interest, that Ferrell was not capable of performing the essential functions of some of the positions (the Urology Clinic, the Cardiology Clinic, the ER RN, the PAT position, and the Inpatient Rehab Liaison), and that the Hospital was not required to transfer Ferrell to a position for which she was qualified (the Case Management position, the CDI Specialist position, and the PAT position) at the expense of a more qualified[18] candidate (thereby "waiv[ing a] legitimate, non-discriminatory employment polic[y]"). *See Burns*, 222 F.3d at 257. Notably, the Hospital's hiring policy stated, "[b]oth internal and external applicants shall be considered for open positions. In all cases the most

---

[18] The Court notes that the term "qualified" is used frequently throughout this analysis. However, there is a difference between an individual being "qualified" for a position under the ADA (which requires that individual be able to perform the essential functions of a position with or without reasonable accommodation) and being "qualified" for a position in the more general sense (which usually requires an individual be competent and knowledgeable so as to serve effectively in said position). With respect to the Defendant's argument that it hired the "more qualified" candidate for certain positions, it is using the second, more general understanding of the term "qualified."

qualified candidate will be hired . . ." (Doc. No. 56-7 at 3).[19] It also noted that "[e]qually qualified internal candidates are given preference over external applicants." (*Id*).

A.    The Case Management position.

Defendant first argues that Ferrell was "not legally entitled" to the Case Management position as a reasonable accommodation because it "was not available when Ferrell expressed interest in it on July 19, 2017." (Doc. No. 48 at 18). Defendant states that the Hospital had already identified its top two candidates, and that on July 6 (thirteen days prior to Ferrell's expression of interest) the hiring manager for the position unposted the listing because she was no longer accepting new applications. As support for this notion, Defendant cites to deposition testimony of Fran Gordon discussing the application and interview process for the Case Management position. (Doc. No. 47-9 at 3-4). Defendant additionally argues that it hired Shannon Summerville for the position, who was more qualified than Ferrell because Summerville had a master's degree in nursing as evidenced by Summerville's resume. (Doc. No. 47-9 at 7). Employers are required to consider transferring an employee with a disability to a position only if it is vacant. *See Burns*, 222 F.3d at 257. Additionally, there is no preferential treatment afforded to an applicant with a disability over applicants without a disability. *See Hedrick*, 355 F.3d at 459 ("Finally, contrary to Hedrick's argument, her disability did not provide her with a preference in WRCS's hiring practices."); *see also Terrell v. USAir*, 132 F.3d 621, 627 (11th Cir. 1998) ("We cannot accept that Congress, in enacting the ADA, intended to grant preferential treatment for disabled workers."); *Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995) ("[W]e do not read the ADA as

---

[19] This particular policy provision is very significant in this case because the ADA "does not require an employer to reassign a qualified disabled employee to a vacant position when such a reassignment would violate a legitimate nondiscriminatory policy of the employer to hire the most qualified candidate." *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 483 (8th Cir. 2007).

requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled."). It logically follows that placement of the plaintiff in a particular job would not be a *reasonable* accommodation if it would require passing over candidates more qualified than the plaintiff. *See Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 484 (8th Cir. 2007) (noting with approval that the Eight Circuit "previously ha[d] stated in dicta that 'an employer is not required to make accommodations that would subvert other, more qualified applicants for the job.'" (quoting *Kellogg v. Union Pac. R.R. Co.,* 233 F.3d 1083, 1089 (8th Cir. 2000) (per curiam))); *Castro-Medina v. Procter & Gamble Com. Co.*, 565 F. Supp. 2d 343, 375 (D.P.R. 2008) (noting that it would be unreasonable to conclude "that the duty to provide a reasonable accommodation includes hiring a less-qualified employee simply because that employee is disabled." (internal quotation marks omitted)). Therefore, the Court finds that Defendant has shown preliminarily a lack of a genuine dispute as to whether the Case Management position was a reasonable accommodation option.

In response, Plaintiff notes that the hiring history for the Case Management position indicated the position was not actually filled (via the selection of Summerville) until July 28, 2017, which was well after Ferrell's expressed interest. (Doc. No. 56-16 at 1). Moreover, the Case Management position job description was consistent with Ferrell's physical restrictions (Doc. No. 56-17 at 2), and Ferrell had experience in the area (Doc. No. 56-9 at 2), whereas Summerville did not. (Doc. No. 56-8). From this evidence, the Court believes that a reasonable jury could find that the Case Management position was a viable and reasonable accommodation for Ferrell.

B.    The RN positions in the Urology Clinic, Cardiology Clinic, and ER.

Ferrell applied for three additional RN positions: one in the Hospital's Urology Clinic, one in the Cardiology Clinic, and one in the ER. (Doc. No. 55 at 19, 20, 23).[20] Defendant contends that all three of these positions had a physical requirement of walking or standing for 67 percent to 100 percent of the day, just like Ferrell's previous position as an RN in the Hospital's ER. As evidence of this, Defendant points to Jones's deposition, where he explains that all RN positions have the same physical requirements. (Doc. No. 47-2 at 9-10). Defendant additionally cites to the job-descriptions of the Urology Clinic position (Doc. No. 47-10 at 9), Cardiology Clinic position (Doc. No. 47-11 at 10), and ER RN position (Doc. No. 47-2 at 52); all of which list, as a physical requirement, walking or standing at 67 percent to 100 percent of each day. Finally, Defendant cites to the deposition of Sandra Milliken, the hiring manager for the Urology Clinic (Doc. No. 47-10 at 6), and to the deposition of Latonya Cross, the hiring manager for the Cardiology Clinic (Doc. No. 47-11 at 5), who both confirmed the accuracy of the respective job listings. The Court finds that Defendant has pointed to evidence suggesting preliminarily the lack of genuine dispute as to whether or not Ferrell could perform the job requirements of the RN positions in the Urology Clinic, Cardiology Clinic, and ER, and consequently a lack of genuine dispute as to whether transfer to those three positions were reasonable accommodations.

To show that a genuine dispute exists as to whether Ferrell could perform the essential functions of the Urology Clinic position, Plaintiff suggests that (contrary to the applicable job description), walking or standing more than two-thirds of the time was not in fact an essential

---

[20] As noted above, Ferrell thought that she was applying to a permanent position in the ER's secure hold unit when she once again applied to be an RN in the ER. (Doc. No. 56-1 at 48). As no permanent position in the secure hold unit existed, the Court will evaluate Ferrell's application to the ER RN position, as an application to the full ER RN position, regardless of what Ferrell's intentions were when she originally applied.

function. Specifically, Plaintiff notes that Ferrell testified she had previously worked as an RN in a urology clinic and when doing so never needed to stand or walk for more than 70 percent of each day.[21] (Doc. No. 56-1 at 20-21). Additionally, Plaintiff states that the report of its expert witness, Dr. Hankins, notes that a review of RN clinic positions (including at a urology clinic and a cardiology clinic) do not show a common requirement of walking or standing more than 67 percent of a day. (Doc. No. 56-4 at 18).[22]

Plaintiff cites the same statement from Dr. Hankins's report in an effort to show a genuine dispute as to whether Ferrell could perform the essential functions of the Cardiology Clinic position. (Id.). Additionally, Plaintiff notes that Cross, the hiring manager for the Cardiology Clinic, affirmed that Ferrell could have performed the duties of an RN in the clinic even with her restrictions of needing to sit intermittently for one-third of the day. (Doc. No. 56-21 at 7). As for the ER RN position, Plaintiff cites to the same facts it used previously for the discriminatory discharge claim to try to show that standing or walking for more than 67 percent of a shift was not an essential function.

---

[21] Notably, the figure of 70 percent came not from Ferrell, but rather from the questioning attorney, who asked specifically whether Ferrell needed to stand or walk more than 70 percent of the day at the urology clinic. Ferrell answered that question in the negative but did not indicate what figure she would have chosen for the cutoff. That is to say, Ferrell left unanswered the more relevant (albeit arithmetically similar) question (unasked of her at her deposition) of whether she needed to stand or walk *67 percent* of the time.

[22] Plaintiff additionally argues that Ferrell was more qualified for the Urology Clinic position than the candidate, Jessica Sly, who was hired. However, Defendant appears to argue not that it filled the Urology Clinic position with a candidate *more* qualified than Ferrell, but rather that Ferrell was not able to perform the essential functions of the position and therefore was not qualified for it at all (with or without a reasonable accommodation). The distinction between these two kinds of arguments can be analytically significant, so it is important for the Court to keep in mind which of these arguments it is dealing with. *See Antol v. Perry*, 82 F.3d 1291, 1299 (3d Cir. 1996).

Plaintiff makes similar arguments with respect to the Cardiology Clinic position and the individual ultimately hired to fill it, but because Defendant does not suggest that it hired a more qualified candidate as a reason for not accommodating Ferrell with the Cardiology Clinic position, the Court will not spend time considering that aspect of Plaintiff's argument.

Ultimately, the Court finds that Plaintiff has failed to raise a genuine dispute as to whether Ferrell was qualified for the ER RN position because, as noted above, there was no permanent position in the secure hold unit, and Ferrell was otherwise unable to perform the essential functions of the ER RN position. The Court finds similarly that Ferrell was not qualified for the Urology Clinic position as Plaintiff's cited evidence (Ferrell's own past experience in a urology clinic and Dr. Hankins's general assertions about clinic position requirements as a whole) is not sufficient evidence from which a reasonable jury could find in Plaintiff's favor; it supports, at most, *speculation* that (contrary to the applicable job description) standing or walking more than Ferrell was able to do was not an essential functions of the particular urology clinic position for which she had applied .[23] However, the Court does believe that a reasonable juror could find Ferrell qualified for the Cardiology Clinic position, in light of the deposition testimony of Cross.

C.    Inpatient Rehab Liaison.

Defendant contends that Ferrell was not qualified to be an Inpatient Rehab Liaison, because the job description for the position stated that "bending was required to be performed 67% up to 100% of the time." (Doc. No. 48 at 19 (citing Doc. No. 47-2 at 98)). In the opinion of Jones, Ferrell would not be able to bend down as much as the job description stated was required for the position, given her restriction of needing to be sitting down with her leg elevated for one-third of the day. (Doc. No. 47-2 at 31, 98). Jones stated that he thought it would be "difficult to bend when your

---

[23] As noted above, it is possible for a plaintiff to request an accommodation *within* an accommodation (i.e., an accommodation for a position to which the plaintiff seeks transfer as an accommodation with respect to another position the plaintiff cannot perform without an accommodation). In the present case, an example of this would be Plaintiff requesting the accommodation of a transfer to the Urology Clinic position, and then an *additional* accommodation to allow her to work in that transferee position while adhering to her physical restrictions. However, Plaintiff does not appear to have ever proposed any accommodations that would have allowed her to work in the Urology Clinic position in light of the walking/standing requirements. Accordingly, the Court need not consider this additional option.

right leg is elevated." (*Id.*). Defendant additionally states that Ferrell was not qualified for this position because "she did not meet the education or experience requirements." (Doc. No. 48 at 19-20). As evidence of this, Defendant notes that Dr. Hankins stated that a BSN or MSN is commonly preferred for this type of position, neither of which Ferrell possessed. (Doc. No. 47-12 at 25). However, the Hospital's job description for the Inpatient Rehab Liaison states "Bachelor or Master Degree preferred," not *required*. (Doc. No. 47-2 at 97).

The Court does not believe Defendant has pointed to enough evidence to suggest even preliminarily a lack of genuine dispute as to whether Ferrell was qualified to be an Inpatient Rehab Liaison. Jones's lay opinion—that bending with one leg elevated would be difficult—is far from sufficient to suggest that Ferrell could not perform the job, as he is the HR Director, not a supervisor for the position (or, for that matter, an occupational therapist, physician, human physiologist, etc.). Additionally, the opinion of Dr. Hankins as to what educational credentials are commonly preferred for inpatient rehab liaisons is not probative of what is *required* for such positions. And the Hospital's own job description for this particular liaison position listing states merely that a BSN or MSN is "preferred," not that it is *required*. Defendant has failed to carry its initial burden, and its Motion will be denied as to the Inpatient Rehab Liaison position.

   D. <u>The PAT position.</u>

Defendant contends that Ferrell could not perform the essential functions of the PAT position because (according to Defendant) it required the ability to stand or walk up to 100 percent of the day. As evidence of such, Defendant notes Jones's deposition where he states that all RN positions at the Hospital have the same physical requirements (Doc. No. 47-2 at 9-10), as well as an email from Jones to Ferrell where he states that the PAT position has "the same minimum qualification requirements as [Ferrell's ER RN position" (*i.e.* the ability to walk or stand between

67 percent to 100 percent of a shift).[24] (Doc. No. 47-1 at 192). Defendant also notes that both Carolyn Shupp, the hiring manager for the PAT position, and Michelle Pepper, the director of PAT, testified that PAT RNs are required to walk or stand for at least 67 percent of their day. (Doc. Nos. 47-5 at 5-7, 47-7 at 2-3, 5).

Additionally, Defendant contends that Ferrell was not the most qualified candidate, and therefore it was not required to offer her the position, even if she was able to perform the essential functions. Defendant notes that one of Ferrell's interviewers for the PAT position stated she was "hesista[nt] to hire" Ferrell because Ferrell had criticized the Hospital's commitment to patient care and the interviewer was not sure that Ferrell intended to stay in the position long-term. (Doc. No. 47-2 at 65). Additionally, Defendant points to Shupp's statement that all the interviewers for the PAT position wanted to hire Sunni Patat because she had surgical experience. (Doc. No. 47-5 at 15-16). In her deposition, Shupp even specified that "you could cross the disability out and you've got [Patat] or [Ferrell]. [Patat] was the better candidate to hire." (*Id.* at 22). Ultimately, Patat was hired for the position.

The Court finds that Defendant has pointed to enough evidence to suggest preliminarily that there is a lack of genuine dispute as to whether (i) Ferrell could perform the essential functions of the PAT position and, if she could perform the essential functions, (ii) she was the most qualified candidate for the position. And if either of these questions is answered in the negative, then awarding her the PAT position would not have been a reasonable accommodation. Accordingly,

---

[24] As noted above, applicable regulations state that weight is to be given not only to the job description (and what it indicates about what functions are essential), but also to the employer's judgment as to what functionals are essential. *See* 29 C.F.R. § 1630.2(n)(3). Jones's opinion appears to be a real-time, authorized statement of Defendant's view of what was essential to the PAT position in terms of walking/standing.

Defendant has shown (preliminarily) a lack of genuine dispute as to whether the PAT position was a reasonable accommodation for Ferrell.

Plaintiff responds that Ferrell could perform the essential functions of the position. As evidence of such, Plaintiff notes that Dr. Hankins's report shows that most PAT positions do not require more than 67 percent of a day to involve walking or standing. (Doc. No. 56-4 at 15-16). Additionally, it is undisputed that Ferrell was interviewed for the position, even with full knowledge of her restrictions. After the interview, Ferrell received two "yes" votes, one "no" vote, and one "inconclusive" vote. (Doc. No. 56-11). All four interviewers additionally scored Ferrell as having "strong evidence of superior skill/quality" for every section of the Interview Evaluation Matrix. (*Id.*). Plaintiff also contends that Ferrell was more qualified for the position than the individual who was ultimately hired. Plaintiff notes that while Patat had a bachelor's degree in nursing (compared to Ferrell's associate degree), Ferrell had been practicing as a nurse since 2005, and Patat had been a nurse only since 2011. (Doc. Nos. 56-14 at 6, 56-36 at 2, 4).

The Court believes that a reasonable jury could find both that Ferrell was qualified for the PAT position (in that she could perform the essential functions) and that she was the most qualified candidate who applied. Thus, Defendant's Motion will be denied as to the PAT position.

E.    The CDI Specialist position.

Ferrell also applied for a CDI Specialist position. Defendant admits that this position was both available when Ferrell applied and compatible with her physical restrictions. (Doc. No. 48 at 20). Defendant argues, instead, that Ferrell was not the most qualified candidate, and the Hospital had no duty to place her into the position simply because she could perform it. Defendant contends that the most qualified applicant for the position was Crystal Payne, who was ultimately hired.

(Doc. No. 48 at 23). Payne applied for the CDI role in April 2017. (*Id.* at 22). And it is undisputed that Ferrell applied months later, on July 19, 2017.

It is also undisputed that the Hospital directed Ellis to consider only candidates with ICU experience for the position. Payne had worked as an RN in an ICU since August 2015, and prior to that had also worked as an RN in an ICU from January 2011 to October 2014. (Doc. No. 47-8 at 51-52). Additionally, Payne had experience working with medical records. (*Id.* at 55). Though Ferrell had ICU experience, Defendant notes she did not list it on her application for the CDI position, because she did not think it was required. (Doc. No. 47-1 at 115). However, Ferrell's resume, which Jones sent to Ellis on July 20, 2017, did list her experience as an ICU RN from 2005 to 2007. (Doc. No. 47-8 at 41-42). But Ellis stated in her deposition she did not recall ever reviewing Ferrell's resume. (Doc. No. 47-8 at 20).

On the basis of this evidence, the Court does not believe that no reasonable jury could find in Plaintiff's favor as to the question of whether Ferrell was the most qualified candidate for the CDI position, such that providing it to her would have been a reasonable accommodation. Thus, Defendant has not satisfied its initial burden and its Motion will be denied as to the CDI Specialist position.

## CONCLUSION

For the reasons discussed herein, Defendant's Motion will be **GRANTED in part** and **DENIED in part**. Specifically, Defendant's Motion will be granted as to Plaintiff's claim for ADA discrimination, and it will be denied as to Plaintiff's claim for ADA failure to accommodate.

But although Plaintiff's claim for failure to accommodate survives the Motion, it does not survive unscathed. As noted above, the Court found that Plaintiff failed to meet its burden to show: (i) that Ferrell's request to transfer to the ER RN position was a request for a reasonable

accommodation; and (ii) that Ferrell's request to transfer to the Urology Clinic position was a request for a reasonable accommodation.

Rule 56(g)[25] addresses how the Court should proceed where a summary judgment movant is entitled to some but not all of the relief requested by the movant. In the present case, although the Court will not grant Defendant summary judgment on Plaintiff's failure-to-accommodate claim, Defendant has shown via the instant motion that it is entitled to some relief on that claim; specifically, Defendant should prevail on it to the extent that it is based on Defendant not allowing Ferrell to transfer to the ER RN position or to the Urology Clinic position. Rule 56(g) indicates that an appropriate form of relief in this situation is an order effectively removing from Plaintiff's arsenal the issues (theories) on which Defendant has prevailed. The Court will issue such an order in this case, finding that there is no genuine issue of material fact as to whether Defendant failed to provide a reasonable accommodation by denying Ferrell's request to transfer to these two positions in particular, and that it shall be deemed established in this case that Defendant did not fail to provide a reasonable accommodation by denying Ferrell's request to transfer to these two positions.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[25] "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damage or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed R. Civ. P. 56(g). To be sure, this provision is not a model of clarity with respect to its own applicability. However, the Court concludes that Rule 56(g) applies to the issues (the theories in support of the failure-to-accommodate claim) on which Defendant has prevailed and authorizes the substance of the order the Court will issue.